Filed 10/30/13  P. v. Lowder CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070831 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F03901) |
| v. | |
| TIMOTHY LOWDER, | |
| Defendant and Appellant. | |

Two juries each convicted defendant Timothy Lowder of two counts of lewd acts against a child under the age of 14, and the second jury sustained a multiple-victim allegation.  (Pen. Code, §§ 288, subd. (a), 667.61, former subd. (e)(5) [now subd. (e)(4)].)  The trial court sentenced defendant to prison for an unstayed term of 38 years to life, and defendant timely appealed.

On appeal, defendant raises a number of claims of evidentiary error, challenges one instruction, and also challenges certain monetary impositions.  Finding no error, we shall affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The first jury convicted defendant of two lewd act counts against M., defendant's niece, but deadlocked on two lewd act counts involving L., defendant's daughter, and a mistrial was declared as to those counts. The second jury convicted defendant of two lewd act counts against L., and sustained the multiple-victim allegation.

The evidence at the two trials largely overlapped. We first will describe the evidence from the first trial. We will not repeat substantially similar evidence introduced at the second trial, but instead describe the material differences at that second trial.

### First Trial

#### L.

L., defendant's daughter, was born in 2001 and was nine at the time of trial. On Christmas Eve or the night of Christmas, when she was seven and after her parents were divorced, defendant visited the family home and spent the night. While her mother and brother were asleep, L. was on the couch with defendant in the living room, watching television. Defendant touched her "private part" with his hand, under a blanket (count I). She told him to stop and moved to a chair. Defendant sat in the chair and touched her private part again, over her clothes (count II). She again told him to stop, and she went to bed. When she was about four or five, she was watching a movie on the couch and defendant accidentally touched her "privates" over her clothes, when he was rubbing her belly. She finally told her mother about the incidents because, "I was just hurting inside, because I don't like keeping secrets."

#### L.'s prior statements

On April 13, 2009, Detective Mims monitored an interview of L. at the "SAFE Center," referring to "Special Assault Forensic Evaluation." A recording of this

2

interview was played for the jury.[1] L. said defendant touched her "inside the wrong place[,]" and first did it by accident while "he was just trying to rub my belly, but the second time he did it on purpose." This second incident had been at Christmas, and she had told him to stop "and then he [kept] on doing it again and again." Contrary to her trial testimony, she said he first touched her in the swivel chair, and then touched her on the couch, but then she said, "Actually, first it was on the couch and then I moved to the swirly chair and then he went to the swirly chair and he [kept] on touching me in the wrong place and I said, 'Stop it,' and he [kept] on doing it and then I just said, 'Good night.'" She again said it started on the chair, but later repeatedly said it started on the couch. He touched her over her pajamas, multiple times because she would try to move his hand away and he would put his hand back on her.

*L.'s mother Anne-Marie*

On March 13, 2009, L. told her mother that defendant "had touched her privates" when she was four, before Anne-Marie and defendant had divorced. Anne-Marie asked L. if it could have been an accident, but L. "was very adamant and said, 'No.'" L. cupped her hands over her vagina to show where defendant had touched her, and at one point L. covered her face with her hands. A couple of days later, L. mentioned the Christmas incident. When Anne-Marie asked L. why she had waited to say anything "she cried and said, 'Because I didn't want to get Daddy in trouble, and I didn't want Daddy to go to jail.'" Anne-Marie called defendant around March 14 or 15, 2009, and told him L. had said he touched her privates, and he did not deny the allegation, instead, "[t]here was a long silence on the phone, and then he said, 'Wow. Whoa. Wow.'" When defendant called sometime later to ask when he could see his children and when they could discuss

_____

[1] Various recordings introduced at the two trials are not in the appellate record. Because the parties quote from written transcripts of the recordings used at trial, which are in the record, and do not contend they are inaccurate, we, too, quote from those transcripts.

L.'s claims, he did not deny the claims, but "begged me and told me that he would go get help[,]" and said he did not think L. would lie about such a matter. Anne-Marie had noticed that L. had been less "enthusiastic to see" defendant before then.

Later, Anne-Marie initiated a recorded pretext telephone call to defendant. In that call, defendant said he did not remember why he did "anything" and did not know what happened, but "all I can think of is it was in a drunken stupor, and I didn't know what the fuck I was doing." He admitted he did not think L. would lie about this, and then said he was tickling her, "And then I was like, 'Whoa, sorry.' And I was touching her chest, and I didn't mean to. And I was like whoa." When Anne-Marie referred to an incident when defendant videotaped "Kara" "and zoomed in an out of her behind[,]" and then asked defendant about M., defendant said, "That was when I was like 17 or something like that. I told you about that. I told you I had talked about that with M., and I tried to work that out. And I was wrong." He then referenced abuse he had suffered and stated "I just was trying to pass on the shame. . . . And it wasn't right." When asked if he touched L.'s vagina, he could not remember, but then admitted that, "A couple of years ago, I think I was grabbing her on her inner thigh, and I was like whoa, and I tried -- and I backed off. But I don't know what happened." Defendant promised to obtain counseling.

At trial, Anne-Marie explained that Kara was a 13-year-old former next-door neighbor, and Anne-Marie had found a videotape defendant had shot in which he "was zooming in and out on her bottom." Later, after defendant had the camera, Anne-Marie tried to play the tape back but "I got snow." In 2008, defendant stayed at Anne-Marie's house for several days around Christmas. Although he drank Christmas Day and passed out in the early afternoon, by the time she and her son went to bed at about 9:30 p.m., he was not drunk, and he and L. were still awake.

*Cheyenne*

Cheyenne was born in 1980, and when she was between 12 and 14, defendant had been her mother's boyfriend. When she was about 13, when defendant was telling her a

4

story and brushing her hair "he kind of just kind of kept going down, and then he just kind of rested his hand on my backside for awhile. I just had a kind of a weird feeling, so I just kind of pretended I was asleep, and then he left." He rested his hand on her backside, over her clothing, for "two minutes." Sometimes when he would hug Cheyenne or her sister, "he'd make it so he could put his hands kind of on our chest." She told her mother about the brushing incident the next day and defendant left "probably that night or the next day," but eventually came back.

*Detective Carol Mims*

Detective Mims spoke with M. on the telephone on April 16, 2009, and M. "was emotional[,]" and she spoke with M. in person on May 7, 2009.

Detective Mims interrogated defendant on April 29, 2009, and a videorecording was played for the jury. Defendant said he was "mortified" and "pretty sad" about the fact his daughter said he touched her inappropriately, and he could not figure out what could have happened to cause her to say so, though he admitted to alcohol blackouts. He conceded he had touched L. on the chest while cuddling with her and rubbing her, and that she had given him a "weird" look which caused him to stop. He did not remember touching her vagina, as she had reported. He admitted he had had "other issues" with teenage girls, including Kara, who was about 14: Around 1997 or 1998, he had been videotaping the children playing ball, but his wife "felt like I was zooming in on Kara[,]" on her breasts. He also mentioned that when he was possibly not quite 18 but maybe while in his 20's, there was an incident with M., but "we've worked it out. We talked about it." In this incident, when M. was about eight or nine, they were wrestling, he got aroused, as did she, and she rubbed his penis under his pants until he ejaculated. Both apologized for what happened, and they were "close after that still." Defendant claimed M. started it, and wanted to straddle him and rub her vagina on him. "It was exhilarating, but it wasn't -- I don't know. There was a lot of shame afterwards." When Detective Mims explained that M. had described defendant putting his finger in her vagina,

5

defendant said he had never done that. Defendant had a girlfriend (Lisa) who had two daughters, and once defendant was brushing the hair of the older daughter, who was 12 or 13, when she became upset, apparently because defendant told her she was beautiful. When told that Cheyenne had reported he had "touched her butt on the outside of her clothing[,]" defendant replied, "Um. I don't think it was intentional." He conceded Lisa was distraught about the incident and he had to leave. When Detective Mims stated that defendant had a history, "in that you get aroused by younger girls." Defendant replied: "To a point, yeah." But he denied being aroused by his own daughter, continued to deny remembering doing anything to her, but agreed he needed therapy and asked if the detective had "any references as far as counselors or therapists that would be good for me?" When Detective Mims later repeated that defendant was aroused by younger girls, defendant said, "I've tried to deal with that over the years." He was "nodding in agreement" when she said he was aroused by young girls.

*M.*

M., born in 1983, was defendant's niece. When she was about four or five, she was visiting defendant, in the bed with him, when he touched her vagina under her clothing, but did not penetrate her vagina. She did not report this, "Because I didn't want him to get in trouble." When she was about seven or eight, at the American River, defendant tried to get her to go into the bushes with him, and rubbed her back and "behind area" over her clothing, but defendant got scared when M.'s brother rode by on a bicycle. M. did not report this incident because she thought it was not important. When M. was about 13, at defendant's apartment, lying on his bed, he came in and put his hand on her vagina, under her clothes, for about four or five minutes, and moved his hand around, but did not penetrate her vagina (count III). M. didn't say anything because she was scared. Then he took her hand and made her feel his "hard" penis on the outside of his clothing, and moved her hand around, just "for a couple of seconds," until M.'s brother came in the room (count IV). When she was 13 or 14, at the apartment defendant

6

shared with Anne-Marie, when she was standing in the computer room, defendant "placed his hand on my butt" and moved it around, stating, "I wish that I could be with you." When asked why she continued to be in defendant's presence after he molested her, M. testified she loved him, he was her uncle, and he had been her only consistent male role model. However, she also testified she was scared to report him and hated him at the same time she loved him. After the last incident, when she was 15, M.'s mother sent her to live with defendant and Anne-Marie in Oregon for several months, and she did not tell her mother about what had happened because she did not want defendant to get into trouble, but did tell her mother she did not want to live there. She had no memory of an alleged incident (as described by defendant in his statement to Detective Mims) when she was about eight in which she was wrestling with defendant and she rubbed his penis.

*Defendant*

Defendant claimed that at the time of his police interrogation, he was depressed, possibly suicidal, and had been drinking heavily and using methamphetamine. He claimed he was rubbing L.'s stomach while they watched TV, she looked at him and he realized his hand "had lingered at her chest," so he apologized. He never intentionally touched her vaginal area. He had no sexual interest in his daughter, or in other young girls. He never intentionally touched Cheyenne's buttocks. He denied any incident with M. when she was three or four, and denied a sexual interest in her. The incident he described to Detective Mims in which he ejaculated as he wrestled with M. happened when she was about five or six (not eight, as he had said before) and was "quite disgusting." He admitted it was "exhilarating" at the time, as he had told Detective Mims, and claimed that was the issue on which he requested a referral to a counselor. He denied the incident M. described at the American River. He claimed he denied touching L. inappropriately when Anne-Marie first called him to ask about it. He claimed Kara, aged 13, had been infatuated with him, which he found flattering. He denied zooming in and out on Kara's breasts when he videotaped Kara.

7

The first jury convicted defendant of the two counts involving M., but deadlocked on the counts involving L., and the trial court declared a mistrial on those counts.

*Second Trial*

The principal differences at the second trial were that the second trial judge admitted additional uncharged act evidence regarding Destiny and evidence that defendant made sexual modifications to Barbie dolls that the first trial judge had excluded, M. did not testify (but the parties stipulated that defendant had been convicted of molesting her), and an expert testified about Child Sexual Abuse Accommodation Syndrome (CSAAS).

*Anne-Marie*

Anne-Marie testified at the second trial consistent with her earlier testimony. She also testified that she had purchased Barbie dolls for L.'s birthday, they went missing, and Anne-Marie found them in February or March of 2007, in a work shed, with added nipples, "Areolas that looked very realistic[,]" and vaginas and labia. Barbie dolls do not come with such features.[2]

In the second trial, a longer version of the pretext call Anne-Marie made to defendant was played for the jury. In the newly admitted portions on the call, Anne-Marie referenced "the dolls that [defendant] mutilated and created vaginas out of them, and then Destiny." Defendant said, "the dolls had nothing to do with anything" and that Destiny "was trying to hump my foot." He claimed he did not know they were his daughter's dolls, and claimed he found them in the shed, or in the back room. He claimed the dolls were not "about the kids" and he "was tweaking out of my fucking mind and bored."

_____

[2] Contrary to some indications in the appellate record, the parties assume that the actual dolls were not admitted into evidence, and that only color pictures of them were introduced at trial. We need not resolve the point, because it makes no difference to our analysis.

8

To "give context" to that portion of the pretext call, Anne-Marie testified that Destiny was an eight-year-old neighbor who had told Anne-Marie about inappropriate touching by defendant, and M. had also told Anne-Marie about inappropriate touching by defendant. Anne-Marie also testified L. told her she waited to reveal the abuse because she did not want defendant "getting mad at me and I didn't want daddy to get in trouble and go to jail."

*L.'s grandmother*

L.'s grandmother testified L. told her defendant had touched her privates over her clothes, she had "told him no" and moved to the swivel chair, but defendant followed her there, touched her again, and she again said to stop, and left the room.

*L.*

L. testified that during the Christmas incident, defendant touched her first on the couch and then on the chair, and long before there was an incident when he accidentally touched her privates when he was rubbing her belly.

*Detective Mims*

Detective Mims's testimony was largely consistent with the first trial. More parts of her recorded interrogation of defendant were played for the jury than at the first trial. In particular, defendant discussed Destiny, about age eight, "humping" his foot more than once. He denied the dolls had anything do with children, claiming he had been trying to get Anne-Marie interested in a hobby. He thought he "did a great job. And I wish I could get the damn Barbie just so I could see if I could sell it on EBay." He made "nipples on her and made a vagina out of like this rubber stuff" "basically just seeing if I could do it."

*Cheyenne*

Cheyenne's testimony at the second trial was largely consistent with the first trial.

9

*Dr. Anthony Urquiza*

Dr. Urquiza was a psychologist who ran a child abuse treatment program at UC Davis Medical Center, and a professor in the pediatrics department. He had testified as an expert in CSAAS "probably a little over" 200 times, mostly for the prosecution. CSAAS was a teaching tool for therapists treating sexually abused children, *not* a diagnostic tool to determine if abuse has occurred. He knew nothing about the facts of this case.

CSAAS has five components: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) retraction (not an issue in this case, as L. did not retract her testimony). Secrecy refers to the fact that in most child sexual abuse cases the child knows the abuser, who is usually bigger or stronger and often in a position of authority over or danger towards the child or loved ones, or a source of special attention, and therefore the child will not disclose the abuse; it is a common myth that most abuse occurs at the hands of strangers. Typically abusers "groom" their victims by starting in small ways and progressing to more serious abuse. Helplessness refers to the fact that it can be psychologically difficult for a child to report an abuser. Entrapment and accommodation refers to how children deal with the feelings of helplessness because of the secret abuse, such as by wearing extra clothing or pretending to be asleep during the abuse, or by dissociation, where they shut down their feelings to cope with the experience. Delayed and unconvincing disclosure refers to the fact that it is common for children to delay disclosing for months and years, by which time their memory of the details may have degraded. Generally, the closer the relationship between the abuser and the child, the longer it will be before the child discloses.

*Defendant*

Defendant testified he bought Anne-Marie craft supplies because she was interested in a Barbie doll Website, but admitted he had added the nipples and genitalia to the dolls, while he was using methamphetamine, to try to sell "risqué" dolls on the

10

Internet because "sex sells." When asked if he was proud of his work, he testified he thought he "did a decent job on the nipples." He hid the dolls so his children would not find them, not because they were inappropriate. Anne-Marie found the dolls early in 2007, became angry, and they separated a month later.

Kara was helping him film L.'s first steps walking towards him, he put the camera on a couch, and Kara walked in front of the camera "and bent over, and I guess it looked down at her cleavage."

Destiny "would run up and grab" defendant, and it made him "uncomfortable" when she sat on his foot and "was rubbing her crotch on my foot."

He brushed Cheyenne's hair, after he had been up for days using methamphetamine, and she avoided him thereafter, but he did not think he had touched her inappropriately.

He was rubbing L.'s stomach on the couch at Christmas and accidentally touched her chest, and moved his hand when she looked at him. He never touched her vaginal area. In the incident when L. was four or five "I accidentally was reaching for the far side of her legs and I went between her legs for a second like that. 'Whoops, sorry.' It was like that."

Defendant ejaculated when M., aged eight, was rubbing on him. He denied touching M.'s vagina, but conceded he had been convicted of it.

*Stipulations*

The parties stipulated "that the defendant was convicted of putting his hand on his niece M[.]'s vagina and having her put her hand on his penis between September 20, 1995 and September 19, 1997."

The parties also stipulated defendant was not under the influence of alcohol or methamphetamine during the Christmas Day incident.

**DISCUSSION**

We address defendant's contentions in a different order than he briefs them.

11

# I

## *Barbie Doll Evidence*

The first trial judge excluded the Barbie Doll evidence.  The second trial judge admitted this evidence.   In separate claims, defendant contends the second trial judge should not have reconsidered the earlier ruling, and contends that the evidence was unduly prejudicial.

### A.  Reconsideration by Second Trial Judge

Defendant contends the second trial court should not have reconsidered the ruling made by the first trial court, excluding the Barbie dolls.  We disagree.

#### 1.  Background

The first trial court granted a defense in limine motion to exclude evidence of the Barbie dolls, finding the conduct was not unlawful, Barbie and Ken dolls are adult figurines, and "what was done to these figurines, in my view, the prejudicial effect of that evidence outweighs the probative value[.]"

The second trial court found the dolls "provide a window into the Defendant's mind.  It shows his intent towards his daughter."  The trial court agreed they were "extremely prejudicial" and Barbie dolls were "an iconic symbol in our society[,]" but also found that sexualizing his daughter's dolls was highly probative of his intent, so that excluding them would misrepresent defendant.  Later, the trial court emphasized the facts about the dolls were for the jury to decide, in that Anne-Marie claimed they "were purchased for her daughter and were modified shortly [before] the allegation of the molest.  Mr. Lowder says he was in a drug-induced state and modified the dolls that had been purchased years before."

In argument to the jury, the defense dismissed the Barbie dolls as "nonsense[,]" and argued "Barbie dolls are . . . depictions of adult women, albeit admittedly unrealistic" and argued that they had been introduced to inflame the jury.

12

2. Analysis

First, we agree with the People that defendant has forfeited his contention, because he never argued the second trial court was precluded from reconsidering the ruling of the first trial court. (See Evid. Code, § 353, subd. (a) [objections must be timely and specific]; *People v. Neely* (1999) 70 Cal.App.4th 767, 781-782 [law of the case objection forfeited].) Defendant's in limine motion replicated verbatim the motion he made before the first trial. During argument on the in limine motion before the second trial, defense counsel *mentioned* the first trial court's ruling, but did not argue that ruling precluded reconsideration of the issue by the second trial court, and the second trial court stated in part, without objection, "I do appreciate a prior judge's ruling, [but] I'm not bound by it." By failing to object on the ground now urged, defendant has forfeited the claim.

Second, as summarized by a case cited by defendant:

> "[T]here are exceptions to the rule one judge may not overrule the order of another.[fn.] Of significance here, our Supreme Court has held reversal of a judgment on appeal and remand for a new trial 'permits [the] renewal and reconsideration of pretrial motions and objections to the admission of evidence.'. The court did not limit the power of reconsideration to the same judge who made the orders in the first trial. It is difficult to see why a new trial after a mistrial should be treated differently in this respect from a new trial after a reversal on appeal. We recognize a new trial after the unqualified reversal of a judgment on appeal is conceptually distinguishable from a mistrial. In the former the issues have been litigated to finality. In the latter, no issues have been decided definitively. The former is a 'do over.' The latter is a 'never done.' But this distinction, we believe, strengthens the justification for reconsideration after a mistrial. In the case of a mistrial the issues remain in flux, the rulings remain interlocutory and the outcome remains undetermined." (*People v. Riva* (2003) 112 Cal.App.4th 981, 991-992 (*Riva*).)

Nonetheless, defendant contends there was error in *this* case, because a trial court should not lightly "reverse" the ruling of another judge. (See, e.g., *Riva*, *supra*, 112

13

Cal.App.4th at pp. 992-993 ["comity" militates against reversing another judge's ruling absent "a highly persuasive reason for doing so--mere disagreement" insufficient].)[3]

We agree with the People that, at best for defendant, *Riva* states a prudential rule cautioning against reopening all issues previously decided in a case. Here, defendant had notice of the People's intent to seek admission of the Barbie doll evidence, and had an opportunity to oppose that evidence, fully comporting with due process, therefore the ruling was not arbitrary. "Absent a statutory provision precluding relitigation, a stipulation by the parties, or an order by the court that prior rulings made in the prior trial will be binding at the new trial, objections must be made to the admission of evidence (Evid. Code, § 353), and the court must consider the admissibility of that evidence at the time it is offered. [Citations.] *In limine* rulings are not binding." (*People v. Mattson* (1990) 50 Cal.3d 826, 849-850; see *People v. Sons* (2008) 164 Cal.App.4th 90, 100 ["law of the case" applies to prior *appellate* court rulings, but trial judges "are not bound by rulings made at trial by a previous trial court judge. Trial court judges are independent judicial officers. They have both the right and the duty, consistent with their oaths of office, to exercise their best judgment, not to abandon it to previous trial court rulings"].)

Thus, the second trial court here had an independent duty to consider the admissibility of the Barbie doll evidence, and exercised that duty. We find no error based on any alleged preclusion--absolute or prudential--against reconsideration of the issue.

*B. Undue Prejudice*

Defendant contends the Barbie doll evidence was unduly inflammatory and prejudicial and therefore should have been excluded. We disagree.

_____

[3] In his reply brief, defendant argues the rule stated in *Riva* is so clear that his failure to object to reconsideration by the second trial court is excused because the second trial court *was bound to overrule* that objection, therefore objection to reconsideration would have been futile. But he also argues this case fits within the prudential exception to *Riva*, undermining his claim that futility excused an objection.

First, we reject defendant's view that the evidence was irrelevant, or minimally relevant. The People had to prove defendant touched the victim with lewd intent. (§ 288, subd. (a).) Defendant's not guilty plea placed his intent at issue, and the Barbie dolls rationally tended to prove that disputed fact of intent. (See *People v. Rowland* (1992) 4 Cal.4th 238, 260; Evid. Code, §§ 210 [relevant evidence has "any tendency in reason to prove or disprove any disputed fact that is of consequence"], 1101, subd. (b) [evidence of prior acts not inadmissible if used to prove, inter alia, "intent"].)

Although the inference is not *compelled*, and defendant testified to an alternate inference, a rational jury could infer that the addition of genitalia to the dolls reflected a sexual interest in young girls. Indeed, defendant himself admitted the modifications were sexual, although he denied that the dolls reflected *his* sexual interests. Further, although again the inference is not compelled, the jury could rationally credit the disputed testimony and find that these dolls had belonged to L., and therefore that these modifications reflected defendant's sexual interest in her in particular. Either or both of these rational inferences would bolster the People's theory that when defendant touched L. as she testified, he did so with lewd intent. (See *People v. Memro* (1995) 11 Cal.4th 786, 864-865 (*Memro*) [sexually explicit photographs and stories about young males, including children, admitted to show lewd intent towards boys]; *People v. Bales* (1961) 189 Cal.App.2d 694, 701 [nude photograph of victim tended to show lewd intent].) It was for the jury to determine whether the dolls illuminated defendant's lewd intent.

Defendant's objection that a Barbie doll depicts an adult character, not a child character, goes to the weight of the evidence. Such dolls are designed for use by children and their physical unrealism is manifested in part by a *lack* of genitalia. The jury could rationally infer that by modifying those dolls in what defendant conceded was a sexual way, they reflected his intent to sexualize children. And the fact Anne-Marie testified she found the dolls *before* the charged offenses does not make them irrelevant, because the

jury could rationally conclude that defendant's sexual interest in young girls was longstanding.

Second, we reject defendant's view that the dolls were too inflammatory.

Evidence Code section 352 (§ 352) provides in full: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*Harris*, *supra*, 60 Cal.App.4th at p. 736.) "'Prejudice' does not mean a result which is unfavorable, it means a result which is unfair." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1109; see *People v. Yu* (1983) 143 Cal.App.3d 358, 377.) "'The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

As we recently pointed out: "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167 (*Holford*).) Moreover, "Trial courts enjoy '"broad discretion"' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Holford*, *supra*, 203 Cal.App.4th at pp. 167-168.)

16

In the second trial, the parties stipulated that defendant had been convicted of putting his hand on M.'s vagina and having her put her hand on his penis. Further, the jury heard L.'s testimony and prior statements about the charged acts. The record on appeal includes color photographs of the dolls. The modified dolls were not so distasteful or upsetting that they would cause jurors to become inflamed against defendant so that they would *unfairly* assess all of the trial evidence.[4] Further, the dolls did not "prey on the emotions of the jury" (*McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1385) as defendant claims. (AOB 26-27) Far more disturbing evidence admitted to prove sexual intent has been held to fall within the trial court's broad discretion. (See *Memro*, *supra*, 11 Cal.4th at pp. 864-865 [photos of "young boys in sexually graphic poses"]; *People v. Clark* (1992) 3 Cal.4th 41, 129 [depiction of "a decapitated head orally copulating a severed penis"].)

Thus, the trial court did not abuse its discretion by finding the probative value of the Barbie dolls was not "'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice[.]" (*Holford*, *supra*, 203 Cal.App.4th at p. 167.)

Finally, to the extent defendant contends the evidence violated federal due process principles, we disagree. "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v. Kelly* (2007) 42 Cal.4th 763, 787; cf. *People v. Partida* (2005) 37 Cal.4th 428, 439 [even if evidence should be excluded under state law, its admission "results in a due process violation only if it makes the trial *fundamentally unfair*"].) As explained, there

_____

[4] As we said in a similar context, "Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737 (*Harris*).)

were two inferences the jury permissible could draw--but were not compelled to draw--from the Barbie doll evidence, *viz.*, that defendant had a lewd intent toward young girls generally, and that he had a lewd intent toward his daughter in particular.

II

*Uncharged Acts for Propensity*

Defendant challenges the constitutionality of Evidence Code section 1108 (§ 1108), and claims the trial courts each abused their respective discretion in admitting evidence of uncharged acts pursuant to that statute.

A.  *Constitutionality of Section 1108*

Section 1108, subdivision (a) provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Thus, section 1108 allows the introduction of evidence that a defendant committed prior uncharged sexual offenses in order to prove her or his *propensity* to commit such offenses, notwithstanding the general rule that makes character evidence inadmissible to prove a person's "conduct on a particular occasion."  (Evid. Code, § 1101, subd. (a).)

Defendant attacks the constitutionality of section 1108 on due process and equal protection grounds, conceding his claims have previously been rejected by California courts, including this court.  (See *People v. Falsetta* (1999) 21 Cal.4th 903, 918-919 [explicitly resolving due process challenge and discussing with approval *Fitch*'s rejection of equal protection challenge]; *Holford*, *supra*, 203 Cal.App.4th at pp. 182-186 [due process and equal protection]; *People v. Fitch* (1997) 55 Cal.App.4th 172 (*Fitch*) [due process and equal protection].)  We again reject his claim.

B.  *Admission of Uncharged Acts at Each Trial*

Defendant contends each trial court abused its discretion in admitting section 1108 evidence at each trial.  We disagree.

18

1.  The Law

In *Fitch*, we explained the role of section 352 in decisions to admit section 1108 evidence as follows:

> "[S]ection 1108 has a safeguard against the use of uncharged sex offenses in cases where the admission of such evidence could result in a fundamentally unfair trial. Such evidence is still subject to exclusion under . . . section 352. [Citation.] By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. [Citation.] This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*Fitch*, *supra*, 55 Cal.App.4th at p. 183.)

In *Harris*, we elaborated on that role by detailing appropriate factors a trial court should ordinarily weigh in assessing whether particular uncharged act evidence should be properly admitted pursuant to section 1108 in a particular trial, including the inflammatory nature of the uncharged act evidence as compared to the charged evidence, the probability of jury confusion, the remoteness of the uncharged act evidence, the consumption of trial time, and the probative value of the uncharged act evidence. (*Harris*, *supra*, 60 Cal.App.4th at pp. 737-741.)

2.  Background

The first trial court admitted the prior uncharged acts involving M., Kara, and Cheyenne, but excluded references to Destiny, as being too "tenuous" to be admissible. The second trial court permitted the introduction of evidence of the Destiny incident, finding Destiny and L. were of the same age (eight), both incidents involved over-the-clothing vaginal contact, defendant "freely admitted to law enforcement" what occurred with Destiny, and the incident was not substantially more prejudicial than probative. However, in the second trial, M. did not testify, but the parties stipulated "that the defendant was convicted of putting his hand on his niece M[.]'s vagina and having her

put her hand on his penis between September 20, 1995 and September 19, 1997." Unlike the first jury, the second jury did not hear about the alleged acts against M. occurring when she was 4 or 5, and when she was 7 or 8 (at the American River). The second trial court found the Cheyenne evidence similar to the charged evidence, defendant admitted touching her, and it was "substantially more probative than it is prejudicial[.]" The second trial court also admitted the Kara evidence.

       3. Analysis

On appeal, defendant contends each trial court abused its discretion in admitting some--but not all--of the uncharged act evidence. In reality, his briefing amounts to a tacit invitation for us to reweigh the relevant section 352 factors.[5]

The evidence that defendant complains of consists of: (1) Evidence at both trials that defendant videotaped Kara and "zoomed in" on either her breasts or her bottom; (2) evidence at both trials that defendant touched Cheyenne's bottom; and (3) evidence at the second trial that defendant allowed eight-year-old Destiny to "hump" defendant's foot.

Contrary to defendant's view, none of these challenged incidents was particularly inflammatory when compared to the charged offenses. The incidents were not remote, because they demonstrated a consistent history of sexual misconduct towards young girls. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285 (*Branch*); cf. *Harris*, *supra*, 60 Cal.App.4th at p. 739 [apart from misdemeanor drunk driving conviction, defendant had led "unblemished" life for 23 years after earlier, highly dissimilar, sexual offense].)

_____

[5] In the opening brief, defendant also appeared to argue that the first trial court was required to state its section 352 analysis on the record. However, there is no such requirement. (See *Quail Lakes Owners Assn. v. Kozina* (2012) 204 Cal.App.4th 1132, 1140.) In the reply brief, defendant appears to concede the point. Defendant also claims in passing that the Kara evidence did not qualify as a "sexual offense" (see § 1108, subd. (d)(1)). But because he does not show where this claim was raised in the trial court, and provides no legal analysis for it, we decline to address it. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*In re S.C.*).)

There was no likelihood of jury confusion, because each incident as described by the evidence was relatively straightforward, the jury in each trial was given the pattern limiting instruction on section 1108, CALCRIM No. 1191 and the parties made appropriate arguments about the evidence.

We do agree with defendant that the fact defendant had not been punished for the prior acts arguably was a factor favoring--but not compelling--exclusion, as it might have tended to confuse the jury. (See *Harris*, *supra*, 60 Cal.App.4th at pp. 738-739 [jury learned Harris was convicted of burglary with great bodily injury, not rape, in prior case, "leaving the rape victim unrevenged"].) But there was no indication that either jury in this case actually was confused about this point, and the prior incidents were not so shocking as to be likely to inflame the jury and deter them from following their instructions. (See *Branch*, *supra*, 91 Cal.App.4th at p. 284.) And, inevitably, the uncharged evidence did consume some trial time in each case, though not so much that it dwarfed other testimony. These two factors, singly or in combination, even if viewed in defendant's favor, did not *strongly* weigh against admission of the evidence.

As we have explained before, the point of section 1108 was to eliminate the similarity requirement previously applicable in assessing the admissibility of character evidence, which required that the prior and current incidents had to be *highly* similar. (*People v. Britt* (2002) 104 Cal.App.4th 500, 504-506 ["the 'signature test' is no longer the yardstick"]; see also *People v. Escudero* (2010) 183 Cal.App.4th 302, 310 (*Escudero*) [section 1108 ensures "'the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility'"].) In this case, all of the incidents were *broadly* similar, in that all of the alleged victims were young girls defendant knew, and that similarity in the nature and accessibility of the victim was relevant to show his propensity to prey on such victims. (See *Escudero*, *supra*, 183 Cal.App.4th at p. 311 ["significant similarities" found because, "In each instance, defendant took advantage of his female victims when they were vulnerable"].)

21

Unlike in *Harris*, emphasized by defendant, the uncharged acts were not so different than the charged acts as to render them of little probative worth, and were not so shocking as to inflame either jury. In *Harris*, we summarized the charged offenses as follows: "Without minimizing the trauma suffered by each [charged] victim, at worst defendant licked and fondled an incapacitated woman and a former sexual partner, both of whom were thereafter on speaking terms with him. Although the assaults described by Tracy and Brenda are criminal, involving a breach of trust by a caregiver, the abuse the victims suffered is, unfortunately, not unusual or shocking." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) The uncharged evidence was that over 20 years before defendant had attacked a woman, beat her unconscious, and left her partly naked and bleeding from the mouth and vagina. (*Harris, supra,* at pp. 734-735.) We held, "The [uncharged] evidence did little more than show defendant was a violent sex offender. The evidence that defendant committed a violent rape of a stranger, as the jury was led to believe, did not bolster Tracy's or Brenda's credibility nor detract from the evidence impeaching their stories." (*Id*. at p. 740.) For that reason we found, "The lack of any significant probative value on a disputed issue weighs strongly in favor of excluding this evidence." (*Id*. at p. 741.)

Compared to the differences between the charged and uncharged acts in *Harris*, the differences here were minor, and the similarity in age, gender, and accessibility of the alleged victims were sufficient to make those incidents relevant to defendant's intent. In short, neither trial court abused its discretion under section 352 in admitting the challenged evidence. (See *Holford*, *supra*, 203 Cal.App.4th at pp. 167-168; *Escudero*, *supra*, 183 Cal.App.4th at p. 312.)

III

*Child Sexual Abuse Accommodation Syndrome*

Defendant attacks the admission of CSAAS evidence in this case, and attacks the instruction on that evidence given by the trial court. We reject both claims.

22

*A. Admission of CSAAS Evidence*

Defendant contends CSAAS evidence should be held inadmissible in California for all purposes, arguing that "[b]ecause of the amorphous and indefinite characteristics of the syndrome, the jury invariably will use the evidence against the defendant and in favor of conviction."

This court and other courts have rejected this argument. "[I]t has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 418; see *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; see also *People v. Brown* (2004) 33 Cal.4th 892, 905-907.)

We adhere to the view that CSAAS is admissible for the limited purposes of debunking commonly-held myths about how children react to sexual abuse.[6]

*B. Instruction on CSAAS Evidence*

Defendant faults the pattern instruction on CSAAS evidence, CALCRIM No. 1193. As given in this case, that instruction provided as follows:

> "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome.
>
> "Dr. Anthony Urquiza's testimony . . . is not evidence that the defendant committed any of the crimes charged against him.
>
> "You may consider this evidence only in deciding whether or not L[.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his [*sic*] testimony."

---

[6] Defendant's reliance on sister-state and lower federal court cases is unavailing; we are not bound by those decisions. We note with approval, however, that defendant cites a number of sister-state cases that militate against his position, and properly acknowledges our prior decision in *In re S.C.*, *supra*, 138 Cal.App.4th 396.

On appeal, defendant contends the instruction was erroneous because there was no true claim of a gap in reporting, and the gap in this case was *shorter* than in most cases, therefore there was "no need to rehabilitate" the victim's credibility "because appellant never challenged her credibility in that regard." But L.'s credibility was placed in issue because she delayed reporting the abuse, and it was not necessary for the People to wait for the defense to explicitly challenge her credibility on this point. "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.) The jury might still wonder why L did not report the abuse *immediately*, the moment it happened, or the next day. That some children wait longer than L. did does not change the fact that she delayed reporting.[7]

Contrary to defendant's claim, the instruction did not lighten the People's burden of proof by inducing the jury to assume the molestation occurred. To the contrary, the jury was instructed that the CSAAS testimony was *not* evidence that abuse occurred, but could be--but did not have to be--considered in assessing whether L. was making the story up or delayed reporting for the reasons explained by Dr. Urquiza. We presume the jury understood and followed this instruction. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Zack* (1986) 184 Cal.App.3d 409, 416.)

VI

*Fines and Fees*

Defendant challenges various monetary orders made by the trial court. We reject each of his contentions of error.

_____

[7] We also note that Cheyenne testified she pretended to be asleep when defendant touched her, a typical "accommodation" mechanism Dr. Urquiza described.

24

*A. Restitution Fine*

The probation report recommended a restitution fine pursuant to section 1202.4 in the amount of $10,000. The trial court imposed a $10,000 restitution fine, payable as provided by Penal Code section 2085.5, subdivision (a).

On appeal, defendant contends the trial court could not impose more than the then-statutory minimum fine of $200, in the absence of jury findings authorizing a higher fine. In support of this contention, he relies on *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*) and *Southern Union Co. v. United States* (2012) 567 U.S. ___ [183 L.Ed.2d 318] (*Southern Union*).

At sentencing, defense counsel began by stating "Request that the fines and fees be minimized to the greatest extent possible." But counsel did not claim that the minimum fine was *compelled*. Accordingly, the point now raised is forfeited for lack of objection in the trial court. (See *People v. Gamache* (2010) 48 Cal.4th 347, 409.)

Moreover, *People v. Kramis* (2012) 209 Cal.App.4th 346 (*Kramis*), rejected the claim that *Apprendi* and *Southern Union* had any effect on a trial court's discretion to select an appropriate fine between $200 and $10,000, because those cases "do not apply when, as here, the trial court exercises its discretion within a statutory range." (*Kramis, supra*, 209 Cal.App.4th at p. 351.) We agree. (See also *People v. Urbano* (2005) 128 Cal.App.4th 396, 405-406 [defendant presumptively able to pay fine out of future earnings; *Apprendi* does not require jury findings on amount of fine]; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487 [absent objection "the trial court could presume the fine would be paid out of defendant's prison wages"].) And in *Kramis*, as in this case, the trial court imposed a $10,000 fine. Therefore *Kramis* is directly on point and we shall follow it.[8]

_____

[8] We note that Lowder's appellate counsel was also Kramis's appellate counsel. In his reply brief, counsel argues *Kramis* was wrongly decided. We disagree.

*B. Booking and Jail Classification Fees*

The probation report recommended that the trial court order defendant to pay jail booking and classification fees of $ 263.85 and $ 28.75, respectively, pursuant to Government Code section 29550.2. The trial court imposed the recommended fees.

On appeal, defendant contends the trial court did not determine his ability to pay these fees, failed to submit the issue of his ability to pay to the jury, and failed to determine the actual administrative costs to the county. We reject each of these contentions.

1. Finding of Ability to Pay

As stated, defense counsel asked that "the fines and fees be minimized to the greatest extent possible." But counsel did not contend defendant *lacked the ability to pay* any particular fines or fees. We have repeatedly held that failure to object in the trial court based on lack of ability to pay forfeits the contention of error. (See *People v. Crittle* (2007) 154 Cal.App.4th 368, 371; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468-1469; see also *People v. McMahan* (1992) 3 Cal.App.4th 740,749-750 [defendant knowledgeable about his ability to pay, and his failure to object to fine recommended by probation officer or offer contrary evidence forfeited claim].) Recently, our Supreme Court agreed with this view. (*People v. McCullough* (2013) 56 Cal.4th 589.)

2. Submitting Ability to Pay to the Jury

Defendant contends the administrative fees are "punishment" and therefore his ability to pay them must be submitted to the jury, generally replicating the *Apprendi* and *Southern Union* claims regarding the restitution fine.

Again, these challenges to the fees are forfeited. Further, by imposing the mandated fees, "The trial court did not make any factual findings that increased" amount of the administrative fees, "beyond what the jury's verdict--the fact of the conviction--

allowed.  Therefore, *Apprendi* and its progeny" did not preclude their imposition."
(*Kramis*, *supra*, 209 Cal.App.4th at p. 352.)

### 3.  Evidence of Administrative Costs

Defendant contends the record is devoid of evidence of the costs incurred by the county to support the amounts of the jail booking and classification fees.

The probation officer's report set forth those costs.  Because defendant did not object to the probation report, we presume the facts contained therein are accurate. (See *People v. Evans* (1983) 141 Cal.App.3d 1019, 1021.)

### DISPOSITION

The judgment is affirmed.


                                        DUARTE            , J.


We concur:



        BLEASE            , Acting P. J.



        MURRAY          , J.


27